UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM P. LIGHTFOOT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KOONZ, MCKENNEY, JOHNSON & DEPAOLIS LLP, <br><br> Defendant. | Civil Action No. 22-238 (JEB) |

### MEMORANDUM OPINION

Perhaps it can be characterized as an occupational hazard, but disputes between law-firm partners tend to devolve into litigation. This case is no exception. Plaintiff William Lightfoot left Defendant Koonz, McKenney, Johnson & DePaolis LLP (KMJD) after working as a lawyer there for several decades. After his departure, KMJD retained the log-in credentials for Lightfoot's Google My Business (GMB) page, which he used to advertise his services online. Lightfoot alleges that the firm subsequently accessed this page without his permission and also altered the telephone number there to KMJD's own as a means to divert clients its way. He brings similar allegations with regard to the GMB page for his new law firm, Plaintiff May Lightfoot PLLC. Plaintiffs believe that KMJD's actions violate two federal statutes — the Computer Fraud and Abuse Act and the Lanham Act — and constitute tortious interference with prospective advantage, negligence, and conversion under D.C. law. Defendant now moves to dismiss all counts. Because the Court finds in the firm's favor on the federal causes of action, it will dismiss them and decline to exercise supplemental jurisdiction over the D.C.-based claims.

1

I.  **Background**

According to Plaintiffs' Complaint, which the Court must credit at this juncture, Lightfoot worked as a lawyer at KMJD for nearly forty years. See ECF No. 1 (Complaint), ¶ 7. During his time there, he advertised his services online through, among other channels, a Google My Business page. Id., ¶¶ 10–11. That page would appear whenever someone searched for Lightfoot's name, and it contained his contact information. Id., ¶ 10.

While he was at KMJD, Lightfoot's GMB page was created using an email address that he believes belongs to Roger Johnson, a partner at the firm. Id., ¶¶ 11–13, 20. The log-in credentials for that email address were always in the control of KMJD. Id., ¶ 14. That became an issue when Lightfoot left in September 2019 and joined another law firm, May Lightfoot PLLC, shortly thereafter. Id., ¶¶ 7–8.

According to Lightfoot's Complaint, KMJD maintained control of the log-in credentials for his GMB page until February 20, 2020, even though he had departed five months earlier. Id., ¶ 15. That prevented May Lightfoot, his new firm, from creating its own GMB page and allowed KMJD to continue to access Lightfoot's page. Id., ¶¶ 16–18. Martindale-Hubbell, Lightfoot's and May Lightfoot's marketing contractor, attempted to gain access to Lightfoot's GMB page and to create a page for the new firm several times during this period. Id., ¶¶ 10, 21–24. At least once, on February 6, 2020, its attempts were met with an email stating that "the owner of William P. Lightfoot['s GMB page] has rejected your request to become a manager." Id., ¶¶ 24–25 (emphasis omitted). Lightfoot asserts that this meant that KMJD had denied access. Id., ¶ 26. Martindale-Hubbell was able to temporarily gain access by appealing this rejection and changed the phone number on the GMB page to Lightfoot's new work line. Id., ¶ 27. KMJD, however,

rebuffed this effort by allegedly changing the number back to its own office line on February 14. Id., ¶ 28.

Although he and his new firm have long since sorted out the problem, Lightfoot is hardly disengaging, perhaps because an arbitrator socked him with nearly a half-million dollar award in favor of KMJD in 2021. See ECF No. 6-1 (Def. MTD) at 2. In any event, he and May Lightfoot filed this lawsuit on January 31, 2022, alleging that KMJD's access and alteration of his GMB page after his departure from the firm violated two federal statutes and several D.C. laws. His Complaint brings five counts: 1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; 2) trademark infringement under the Lanham Act, 15 U.S.C. § 1125; 3) tortious interference with prospective advantage; 4) negligence; and 5) conversion. See Compl., ¶¶ 30–66. Defendant now moves to dismiss.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief may be granted. In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The court need not accept as true, then, "a legal

conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Employment Opportunity Commission v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

**III.   Analysis**

KMJD's Motion seeks an across-the-board dismissal. The Court begins with the federal causes of action alleged in Counts I and II, as those provide the jurisdictional hook that permits Plaintiffs to litigate here. Given that both fall by the wayside, the Court last explains why it will not exercise supplemental jurisdiction over the others.

A.  Count I: Computer Fraud and Abuse Act

Defendant asserts that Count I, which alleges violations of the CFAA, is deficient in several ways: the claim is time barred, Plaintiffs have not pled that there was any unauthorized access, and they have not alleged a cognizable loss. The Court will briefly discuss all three bases, although it relies solely on the third.

KMJD initially argued that the Complaint is untimely because it was not filed "within 2 years of the date of the act complained of or the date of the discovery of the damage," as required by the CFAA's civil-cause-of-action provision. See 18 U.S.C. § 1030(g); Def. MTD at 4–5. By the time of its Reply, however, Defendant has changed its tune. Rather than asking for outright dismissal on untimeliness grounds, KMJD, acknowledging what Plaintiffs point out in their Opposition, see ECF No. 7-1 (Pl. Opp.) at 5–6, asserts only that their CFFA claim must be

limited to the two weeks between February 6, 2020, when Plaintiffs discovered KMJD's unauthorized access of the GMB page, and February 20, when KMJD relinquished control of the page. See ECF No. 8 (Def. Reply) at 4. Both of these dates occurred within two years of January 31, 2022, the date the Complaint was filed. The Court thus need not further examine the timeliness question.

Defendant's second ground for dismissal is considerably thornier. The basis of Plaintiffs' CFAA claim is that KMJD "intentionally accesse[d]" the server hosting their GMB pages "without authorization." 18 U.S.C. § 1030(a)(2); see also Compl., ¶¶ 13–34. KMJD does not deny accessing Lightfoot's page, but rejoins that such access could not have been unauthorized since it possessed the log-in credentials and, by Plaintiffs' own description, "controlled" the GMB page during the relevant time period. See Def. MTD. at 5–9; Def. Reply at 4–5; Compl., ¶¶ 14–15.

Courts in this district have concluded that "a user should be deemed to have 'accesse[d] a computer without authorization' only when the user bypasses an authenticating permission requirement . . . such as a password restriction that requires a user to demonstrate 'that the user is the person who has access rights to the information accessed.'" Sandvig v. Barr, 451 F. Supp. 3d 73, 89 (D.D.C. 2020) (quoting 18 U.S.C. § 1030(a)(2) and Orin S. Kerr, Norms of Computer Trespass, 116 Colum. L. Rev. 1143, 1147, 1164 (2016)) (internal citations omitted). It would seem, then, that a party in possession of the authenticating credentials could not violate the CFAA's prohibition on unauthorized access. Yet courts have also recognized that a party who validly possesses log-in credentials may still access the computer protected by those credentials "without authorization" — as when a departed employee uses her still-working credentials to access her employer's computer. See, e.g., United States v. Steele, 595 Fed. App'x 208, 210–11

(4th Cir. 2014); see also Kerr at 1174–76 (exploring the "gray area" of canceled accounts where credentials continue to function).

The present case is reminiscent of this departed-employee scenario, although the roles have been reversed. Critically, and in contrast to such a scenario, the rightful ownership of the GMB page is in dispute here. While KMJD asserts ownership on the basis that the page was created by its employee using an email address in its control, see Def. MTD at 5–6, Lightfoot argues (or, rather, assumes) that ownership lies with him, since the page advertises his services, and the GMB terms and conditions provide that a "user 'must be the owner of the entity listed'" to access or alter the page. See Compl., ¶ 32; Pl. Opp. at 8–9. If KMJD is correct, its access could not have been unauthorized since it both owned the page and possessed the authenticating credentials. Cf. Kerr at 1174 ("[I]f the user enters her own credentials to access her own private account, that access is authorized."). But if Plaintiffs are correct, should the Court find that Lightfoot's departure from KMJD impliedly revoked the firm's authority to access his GMB page? Fortunately for the Court, it can allow these questions to percolate among those more learned in the field, since no resolution is necessary here. This is because Defendant's third argument for dismissal carries the day.

That one urges the Court to find Count I insufficiently pled because the Complaint has not alleged a loss that meets the CFAA's statutory requirement. See Def. MTD at 9–10. The Act's civil-cause-of-action provision enables plaintiffs to recover damages and injunctive relief "only if the conduct leading to the violation of the CFAA involves one of the factors 'set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).'" Lewis-Burke Associates LLC v. Widder, 725 F. Supp. 2d 187, 191 (D.D.C. 2010) (quoting 18 U.S.C. § 1030(g)). Of the five factors in that subsection, only one is relevant here: subsection (c)(4)(A)(i)(I), which permits

recovery when a CFAA violation causes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." That loss, in turn, is defined to include the costs of responding to a violation and "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

Plaintiffs have not alleged a loss that qualifies, says Defendant, because their purported loss cannot be understood as the price of responding to the offense. In addition, even if lost revenues qualify as a "loss" for the purposes of this statutory requirement, Plaintiffs have not pled that their loss was caused by an "interruption of service." Def. MTD at 9–10. Lightfoot and his firm rejoin that they need not allege this type of loss because they have pled "damage" within the CFAA's definition of that term, and the statute allows recovery for "damage and loss." Pl. Opp. at 9–10 (quoting 18 U.S.C. § 1030(a)(5)(C)).

Plaintiffs are correct that the CFAA permits recovery by one "who suffers damage or loss," but they overlook that provision's additional requirement that "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in" the subclauses discussed above. See 18 U.S.C. §1030(g). To sustain this count, then, Plaintiffs must plead a "loss" of at least $5,000. The Court finds that they have not done so for two reasons.

First, although Plaintiffs allege that they suffered a "loss of more than $2,100,000.00," they do not tie that loss to KMJD actions that occurred during the relevant timespan — namely, the brief period between February 6, 2020 (if the loss resulted from denial of access to the page) or February 14, 2020 (if it stemmed from the changing of the phone number) and February 20, 2020, when they gained control of Lightfoot's GMB page. See Compl., ¶ 34. Instead, they broadly allege losses over the course of "approximately 5 months," which presumably refers to

the time between Lightfoot's departure from KMJD in September 2019 and the firm's relinquishing of control of his page. Id. As discussed above, however, CFAA violations alleged to have occurred before January 31, 2020, would fall outside the statute of limitations and thus are not actionable now, particularly given that Plaintiffs offer no argument or caselaw for the application of some kind of continuing-violation doctrine. Cf. Domain Name Commission Ltd. v. DomainTools, LLC, 449 F. Supp. 3d 1024, 1030 (W.D. Wash. 2020) (dismissing complaint that provided no basis on which to allocate losses between period before and after actionable CFAA violation and thus did not contain plausible inference that loss after that date exceeded $5,000).

Second, even assuming that lost revenues is a valid form of "loss" under the CFAA, Plaintiffs have not alleged that theirs resulted from an "interruption of service," as the statute requires. Although it is not entirely clear from the Complaint which of KMJD's actions allegedly caused the $2.1 million loss, Plaintiffs appear to focus on the changing of the GMB-page phone number, as they attribute the loss to an "improper diversion of potential clients and business leads." Compl., ¶¶ 33–34. They do not contend that this constitutes an "interruption of service," and the Court is skeptical that it could. Their Complaint, consequently, does not sufficiently plead a violation of the CFAA. See Psychas v. District Department of Transportation 2019 WL 4644503, at *11 (D.D.C. 2019) (finding plaintiffs failed to state CFAA claim when they did "not claim any losses incurred in responding to the alleged violation, nor d[id] they claim any losses incurred as a result of the interruption of services").

Before moving on, the May Lightfoot GMB page merits a brief mention. The earlier discussion — like the parties' briefing — focused primarily on William Lightfoot's page. Plaintiffs appear to also allege a CFAA violation based on Defendant's accessing of the server

that contained May Lightfoot's GMB page; their own Complaint, however, undermines that allegation, as it asserts that KMJD's possession of the log-in credentials for Lightfoot's own GMB page prevented the creation of a May Lightfoot page. See Compl., ¶¶ 16–17, 31–33. Even setting aside those contradictory allegations, the same infirmity regarding the failure to plead statutory damages also dooms any claim related to the May Lightfoot page.

Count I, accordingly, does not survive.

B. Count II: Lanham Act

Next up is Count II, in which Plaintiffs allege that KMJD violated the Lanham Act by "misappropriating and altering Mr. Lightfoot's and Lightfoot's GMB account" and "falsely designat[ing] the ownership, origin, and purveyor of the services advertised by Mr. Lightfoot's and May Lightfoot's GMB page in an effort to cause confusion and mistake as to the services offered and advertised by the May Lightfoot GMB page." Compl., ¶ 39; id., ¶¶ 35–44. The firm believes that this count must be dismissed because Plaintiffs have not alleged the three elements of a trademark claim — namely, trademark rights, use of a trademark by KMJD, and likelihood of confusion. See Def. MTD at 10–13.

As a threshold matter, the Court observes that the circumstances of this case are an odd fit for a trademark claim — in no small part because it is not clear what trademark Plaintiffs think Defendant misused: May Lightfoot PLLC or William Lightfoot's own name. As the firm points out, the Complaint often conflates the two. See Def. MTD at 10–11; Compl., ¶¶ 16–17, 35–44. No matter, however, because Plaintiffs simply do not satisfy the elements of a trademark claim for either mark.

To assert a claim of trademark infringement, a "plaintiff must show (1) that it owns a valid trademark, (2) that its trademark is distinctive or has acquired secondary meaning, and (3)

that there is a substantial likelihood of confusion between the plaintiffs' mark and the alleged infringer's mark." Globalaw Ltd. v. Carmon & Carmon Law Offices, 452 F. Supp. 2d 1, 26 (D.D.C. 2006) (citations omitted). These elements are required whether a plaintiff brings a trademark-infringement action, as Defendant believes Plaintiffs do here, or an action for false designation of origin, as Plaintiffs' Opposition maintains. See id. (citing Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington-DC, Maryland y Virginia v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia, 312 F. Supp. 2d 1, 11 (D.D.C. 2004), and American Association for Advancement of Science v. Hearst Corp., 498 F. Supp. 244, 261–62 (D.D.C. 1980)). Regardless of the species of claim, Plaintiffs run aground on the second and third elements.

Trademarks that are not inherently distinctive are entitled to protection "only upon proof of secondary meaning — *i.e.*, upon proof that the public recognizes only one source of the product or service." Globalaw, 452 F. Supp. 2d at 40 (quoting Blinded Veterans Association v. Blinded American Veterans Foundation, 872 F.2d 1035, 1040 (D.C. Cir. 1989)). Personal names — employed alone or as the name of a law firm — are among those marks that require a showing of secondary meaning to gain Lanham Act protection. See 2 McCarthy on Trademarks and Unfair Competition § 13.2 (5th ed. 2022). Proving that a term has acquired such secondary meaning falls to a plaintiff, and that burden "has been described as a 'substantial' or 'vigorous evidentiary burden.'" Globalaw, 452 F. Supp. 2d at 40 (citations omitted). Plaintiffs here have alleged nothing that would meet that demanding standard. Although they state that "May Lightfoot has been used continuously by May Lightfoot since June 1, 2019," Compl., ¶ 38, Plaintiffs say nothing about "the extent of advertising and promotion and amount of money spent thereon, [] figures showing sales of plaintiff's products or number of people who have viewed it,

10

[or] identification of plaintiff's and defendant's respective markets" — factors courts in this district often look to in assessing whether a mark has acquired secondary meaning. PRD, 312 F. Supp. 2d at 12–13 (quoting AAAS, 498 F. Supp. at 257). Indeed, the Complaint does not mention secondary meaning or distinctiveness at all. This alone requires the dismissal of Count II for failure to state a claim under the Lanham Act. See Potter v. Toei Animation, Inc., 839 F. Supp. 2d 49, 53 (D.D.C. 2012) (dismissing claim that "never assert[ed] anything about a distinctive or secondary meaning").

In addition, Plaintiffs have not satisfied their burden to allege a likelihood of confusion, the third element of a trademark action. That element focuses on "the effect of the defendant's mark on prospective purchasers. If the [mark] is likely to have the effect of confusing purchasers into believing that the [defendant's mark] is somehow associated with [plaintiff's mark . . .] or if it would tend to cause purchasers to mistake the [defendant's mark] for [the plaintiff's mark] itself[,] . . . the requirements for finding this element of infringement are satisfied." PRD, 312 F. Supp. 2d at 13 (quoting AAAS, 498 F. Supp. at 257) (alterations in original). The core inquiry, then, is whether a consumer is likely to confuse KMJD's mark with Plaintiffs'.

The Complaint, once again, contains no allegations to this effect either. Instead, Plaintiffs allege that KMJD "falsely designated the ownership, origin, and purveyor of the services advertised by Mr. Lightfoot's and May Lightfoot's GMB page in an effort to cause confusion and mistake as to the services offered and advertised by the May Lightfoot GMB page." Compl., ¶ 39. At the outset, there is a difference between an attempt to cause confusion and actions that likely or actually do so or that mislead consumers. More important, this allegation seems to rest on KMJD's alteration of the phone number to its own. Id. But the phone number is not a mark of either Plaintiffs' or Defendant's, and Plaintiffs do not allege that a

consumer viewing Lightfoot's GMB page would somehow be misled into believing that it is associated with KMJD or that KMJD is linked to Lightfoot. They have, consequently, not alleged a sufficient likelihood of confusion to state a Lanham Act claim. Count II also founders.

C. Remaining Counts

With the Complaint shorn of these two federal claims, this Court lacks subject-matter jurisdiction over what remains, and it will decline to exercise supplemental jurisdiction. Federal district courts are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction. See 28 U.S.C. § 1367(a). By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . .the district court has dismissed all claims over which it has original jurisdiction[.]" Id. § 1367(c)(3). The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966); see also Shekoyan v. Sibley International, 409 F.3d 414, 423 (D.C. Cir. 2005). When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider "judicial economy, convenience, fairness, and comity." Shekoyan, 409 F.3d at 424 (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988)). When all federal claims are eliminated before trial, however, those factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon, 484 U.S. at 350 n.7; see also Edmondson & Gallagher v. Alban Towers Tenants Association, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in Carnegie-Mellon "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

These factors weigh against retention here.  The Court is dismissing both federal claims against Defendant, this case has not progressed in federal court past this Motion to Dismiss, and the Court has developed no familiarity with the additional issues presented.  Cf. Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (holding that district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in the case).  The entire case will thus be dismissed without prejudice, and Plaintiffs are free to file in the District of Columbia Superior Court if they so desire.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss will be granted.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 16, 2022